**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

|                                                      |     |                                          |
| ---------------------------------------------------- | --- | ---------------------------------------- |
|                                                      | )   |                                          |
| **COSME VELAZQUEZ,**                                 | )   |                                          |
|       **Plaintiff,**                                 | )   |                                          |
|                                                      | )   | **Case No.  1:12-cv-09583**              |
|                                                      | )   |                                          |
|       **v.**                                         | )   | **Magistrate Judge Susan E. Cox**        |
|                                                      | )   |                                          |
|                                                      | )   |                                          |
| **CAROLYN W. COLVIN,**                               | )   |                                          |
| **Commissioner of Social Security**                  | )   |                                          |
| **Administration,**                                  | )   |                                          |
|                                                      | )   |                                          |
|       **Defendant.**                                 | )   |                                          |
|                                                      | )   |                                          |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cosme Velazquez ("Mr. Velazquez") seeks judicial review of the final decision of

the Commissioner of Social Security Administration ("Commissioner"), Carolyn W. Colvin,

denying his application for Social Security Disability Insurance ("SSDI") benefits under Title II

of the Social Security Act, 42 U.S.C. §§ 216(i), 223. Mr. Velazquez filed a motion for summary

judgment seeking reversal of the Commissioner's decision [dkt. 15].   For the reasons stated

herein, this Court grants Mr. Velazquez's motion.

## I. PROCEDURAL HISTORY

On January 29, 2010, Mr. Velazquez applied for SSDI benefits alleging disability as of

January 1, 2007.[1] He later amended his date of disability to August 29, 2008.[2] Mr. Velazquez

stated that he could no longer work because he suffered from diabetes mellitus, neck, shoulder

---

[1] Administrative Record ("R.") 195-98. At this time, he also applied for Supplemental Security Income and this
claim was denied on February 24, 2010. He is not presently contesting that decision. R.124-128.
[2] R. 276 .

and back pain, a left wrist, forearm, and hand injury, and vision problems.[3]  On June 14, 2010,

his claim was denied in full.[4] On June 29, 2010, Mr. Velazquez completed a request for

reconsideration.[5] The SSA regional commissioner affirmed the June 14, 2010 denial of benefits.[6]

Mr. Velazquez requested a hearing before an Administrative Law Judge ("ALJ"). [7] On May 9,

2011, ALJ Jose Anglada ("ALJ Anglada") conducted an administrative hearing regarding Mr.

Velazquez's disability benefits claim.[8] ALJ Anglada issued an unfavorable decision on May 27,

2011.[9]  Thereafter, Mr. Velazquez filed a request for review of ALJ Anglada's decision with the

Appeals Council, which was denied.[10] Pursuant to 42 U.S.C. § 405(g), Mr. Velazquez now

requests judicial review of his denial of SSDI benefits by this Court.

## II. STATEMENT OF FACTS

### A. Background

Mr. Velazquez was fifty-six years old and had an eleventh grade education from Mexico

when he appeared before ALJ Anglada on May 9, 2011.[11] For twenty-seven years, the majority

of his working career, he worked for Vulcan Materials, which is a facility that takes limestone

out of the ground, heats it in industrial kilns to convert it to lime, and sells the finished product to

steel mills.[12] Mr. Velazquez started at Vulcan Materials as a laborer in 1979, and worked in that

capacity for a number of years before becoming a foreman.[13] He was then promoted to plant

---

[3] R. 65, 140.
[4] R. 136 – 140.
[5] R. 144.
[6] *Id*.
[7] R. 148-152.
[8] R. 8. Also at issue for ALJ Anglada was whether the insured status requirements of the sections 216(i) and 223 of the SSA were met. ALJ Anglada concluded that Mr. Velazquez's earning records show he had acquired sufficient quarters to remain insured through December 31, 2011.  Any disability must be established to have existed on or before that date in order for the Mr. Velazquez to be entitled to a period of disability and disability benefits.  R.8. This issue was not raised by Mr. Velazquez in his summary judgment motion and is not before this Court.
[9] *Id.*
[10] R. 1-3.
[11] R. 28.
[12] R.29, 52, 222.
[13] R. 30.

manager, a position he held for the next fourteen years.[14] Mr. Velazquez was the only plant manager who worked his way up from a laborer, and to his knowledge, the only plant manager without a college degree.[15] According to Mr. Velazquez, new management took over and he was let go in 2006.[16] Mr. Velazquez applied for disability benefits on January 29, 2010 based on the following medical impairments: diabetes, hypertension, neck and shoulder pain, left wrist, forearm and hand injury, and non-proliferative retinopathy.[17]

**B. Mr. Velazquez's Medical Impairments**

The record contains evidence of the following medical impairments: shoulder, and neck pain, back pain, permanent impairment of the left wrist, forearm and hand, diabetes mellitus, evidence of diabetic retinopathy, neuropathy and renal problems, hypertension, fatigue, and calf pain. The facts pertaining to each are discussed below.

### 1. Shoulder, Neck and Back Impairments

The record reveals that Mr. Velazquez was treated at various medical institutions from June 2009 through the end of 2010 for his shoulder, neck and back pain.[18] He saw physician Steven Clar at Alivo Medical Center in June 2009 for bilateral numbness and tingling in the third through fifth digits of his hands, forearms, and shins and limited movement in his right shoulder.[19] Following this treatment, his Alivo medical records show continued neck and shoulder pain.[20]

---

[14] R. 30, 51.
[15] R. 56-57.
[16] R.56.
[17] R. 30.
[18] *See generally* R. 288-503.
[19] R. 288.
[20] R. 347-48.

On February 24, 2010, Mr. Velazquez went to Stroger Hospital's emergency room with complaints of neck and shoulder pain and numbness to his fingers.[21] An x-ray showed mild degenerative changes in his lower cervical spine.[22] An MRI taken in April 2010 also revealed multilevel cervical spondylosis,[23] mild uncovertebral[24] joint disease[25] narrowing the left and right neural foramens at C3-C4 and C4-C5, a disc bulge and left uncovertebral joint disease narrowing the left neural foramen at C5-C6, and minimal disk bulge, and mild left neural foraminal narrowing relate to osteophyte[26] formation, at C6-C7.[27]

In June 2010, Mr. Velazquez's visited the pain clinic at Ambulatory & Community Health Network of Cook County (ACHN) and he reported that his pain on that day was a four out of ten and he was experiencing neck pain that was radiating into both hands with an increase in numbness and tingling.[28] The treatment plan included physical therapy and visits to the pain clinic for cervical radiculopathy.[29]

In August 2010, after completing two months of physical therapy, he reported that his pain decreased from, at its absolute highest, a seven out of ten to a five out of ten.[30] He also stated he felt happy that the pain was better controlled.[31]

---

[21] R. 331.
[22] R. 376.
[23] R. 377. Cervical spondylosis, commonly known as arthritis of the neck, is a degeneration of the joints in the neck. American Academy of Orthopaedic Surgeons: Cervical Spondylosis, http://orthoinfo.aaos.org/topic.cfm?topic=a00369 (last visited May 8, 2014).
[24] Uncovertable joints are a type of joint that makes up the spine. Physiopedia: Uncovertebral Joints, http://www.physio-pedia.com/Uncovertebral_Joints (last visited May 8, 2014).
[25] Degenerative joint disease is another name for osteoarthritis. *See* Centers for Disease Control and Prevention: Arthritis, http://www.cdc.gov/arthritis/basics/osteoarthritis.htm (last visited May 8, 2014).
[26] Osteophytes are also known as bone spurs. Bone Spur, http://www.webmd.com/a-to-z-guides/bone-spur-topic-overview (last visited May 8, 2014).
[27] R. 390-91, 485.
[28] R. 387.
[29] *Id.*; Cervical radiculopathy usually refers to a pinched nerve. American Academy of Orthopaedic Surgeons: Cervical Radiculopathy, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (last visited May 8, 2014).
[30] R. 512.
[31] *Id.*

By September 2010, however, Mr. Velazquez had to be fitted for a home traction unit due to continued and escalating complaints of pain.[32] Dr. Clar's November 2010 report contained findings of clinical evidence for bilateral cervical radiculopathy as well as diabetic peripheral neuropathy.[33] Dr. Clar's notes showed Mr. Velazquez was started on Gabapentin and Elavil, which along with a home traction unit and home exercises had decreased his pain from a seven out of ten to a five out of ten.[34]

### 2. Permanent Left Hand, Wrist, and Forearm Injury

In January of 1994, Mr. Velazquez sustained a severe fracture to his left wrist and forearm caused by an injury during the course of his employment with Vulcan.[35] In February 1996, Doctor Robert Groya reported that Mr. Velazquez had reached maximum medical improvement, but had permanent loss of function.[36] Dr. Robert Groya's report opined that Mr. Velazquez had permanently lost 85% of the function of his left wrist, hand and elbow.[37] Subsequent to this injury, Vulcan provided Mr. Velazquez with assistance in completing the paperwork required by his position as plant manager.[38]

### 3. Diabetes

Dr. Wen Yang from Alivo Medical Center documented Mr. Velazquez's diabetes as uncontrolled with a possibility of neuropathy explaining the numbness in his hands and legs on June 19, 2009.[39] Insulin was prescribed, and his diabetes was again reported as uncontrolled on June 25, 2009.[40] Over the next few months, the records show improving blood sugar levels with

---

[32] R. 506.
[33] R. 503.
[34] R. 503.
[35] R.13.
[36] R. 13, 282.
[37] *Id.*
[38] R. 39-40.
[39] R. 288.
[40] R. 289.

twice a day insulin injections.[41] Mr. Velazquez consistently reported multiple hypoglycemic episodes per month during this time.[42] Further, in March 2010 there is a note that his insulin may need to be increased to control his blood sugar levels.[43] In September 2010, he was assessed by ACHN as a fifty-five year old man with poorly controlled diabetes and hypertension.[44]

### 4. Diabetic Conditions: Eye Disease, Nerve Damage, and Kidney Impairment

On December 10, 2009, Dr. Yang diagnosed Mr. Velazquez with a retinal hemorrhage and referred Mr. Velazquez to an ophthalmologist.[45] He went to the Specialty Care Center Eye Clinic through ACHN in February 2010.[46] Eventually, in May 2010, he went to the Illinois Eye Institute where his listed ocular conditions included "[m]oderate NPDR".[47] Mr. Velazquez underwent surgery on both eyes to correct the issues associated with his diabetic retinopathy in June and September 2010.[48] He also had multiple laboratory tests done which reported high creatinine levels in his urine.[49] Although a December 7, 2010, renal ultrasound came back unremarkable,[50] subsequent medical records indicate a diagnosis of "probable chronic renal failure" from December 17, 2010.[51] Lastly, his November 2010 records document diabetic peripheral neuropathy,[52] a condition that causes pain, weakness, numbness and/or tingling in the hands and feet as a result of nerve damage.[53]

---

[41] R. 297.
[42] R. 349-56.
[43] R. 298.
[44] R. 515.
[45] R. 295.
[46] R.398.
[47] NPDR is Non-Proliferative Diabetic Retinopathy; R.437.
[48] R. 457.
[49] R. 317, 321, 375, 522.
[50] R. 493.
[51] R. 510.
[52] R. 503.
[53] *See* The Columbia Neuropathy Research Center, http://columbianeuropathy.org/whatis.html (last visited May 8, 2014); The Neuropathy Association, http://www.neuropathy.org/site/PageServer?pagename=About_Facts (last visited May 8, 2014).

### 5. Calf-pain

Mr. Velazquez's records also show a history of pain in his calves. His records from ACHN stated that he "had some claudication type pain".[54] Mr. Velazquez reported experiencing this pain upon walking two to three blocks, and stated he has had to stop walking because of it.[55] In December 2010, Mr. Velazquez again sought medical treatment for his calf pain and the record reveals that he was suffering from claudication symptoms including pain, cramping and fatigue caused by restricted blood flow,[56] in both legs.[57]

### 6. Hypertension

Mr. Velazquez's medical records reflect that he has hypertension.[58] In January 2011, a Carotid Doppler Test showed no hemodynamically significant stenosis.[59] This test did show some atherosclerotic changes[60] in his carotid arteries.[61]

### 7. Fatigue

In June 2009, Mr. Velazquez experienced insomnia.[62] In February 2010, his records reflect that he was on sleeping pills to help combat the insomnia.[63] Later, in May 2010, Mr. Velazquez saw Dr. Clar for fatigue and tiredness after walking one block when he used to be able to walk two to three blocks.[64] His complaints of insomnia continued through the end of

---

[54] R. 511.

[55] R. 513.

[56] National Center for Biotechnology Information: Claudication, http://www.ncbi.nlm.nih.gov/books/NBK235/ (last visited May 8, 2014).

[57] R.525-26.

[58] R. 387.

[59] Problems with blood flow through the carotid artery. MedlinePlus: Carotid Artery Disease, http://www.nlm.nih.gov/medlineplus/ency/article/007427.htm (last visited May 8, 2014).

[60] Plaque buildup in arteries. National Heart, Lunch, and Blood Institute: What is Atherosclerosis, https://www.nhlbi.nih.gov/health/health-topics/topics/atherosclerosis/ (last visited May 8, 2014).

[61] R. 10, 491; The carotid arteries are the arteries in the neck that deliver oxygen to the brain. *Id.*

[62] R. 288-89.

[63] R. 326.

[64] R. 347, 445

2010. [65] Lastly, in February 2011, the medical records report insomnia and "daytime hypersomnolence."[66]

## C. Mr. Velazquez's Hearing Before the ALJ

On May 9, 2011, Mr. Velazquez and his attorney, Thomas Yates, appeared at the hearing before ALJ Anglada. [67] Mr. Velazquez testified about the limitations that he had been experiencing and expanded on the extent of ailments for which he was seeking disability benefits.[68] He confirmed that his neck pain was the major impairment and it had worsened in the past few years. He had continuing shoulder, neck and back pain, fatigue, a limited functioning left wrist and hand, diabetes which left him insulin dependent, hypertension, and calf pain.[69]

Mr. Velazquez also expanded on what his job duties as a plant manager generally entailed.[70] He worked sixteen hours a day, sometimes seven days a week.[71] Specifically, he spent six to eight hours[72] or seventy percent of his workday outside in the plant, and he lifted between ten and twenty pounds on the job.[73] Additionally, he had to teach laborers how to use equipment like a cutting torch, welding machines, plasma cutters, and also how to lay brick. [74] Mr. Velazquez testified that he also operated machinery like pay loaders, mack trucks, and bobcats.[75] He stated that in the last six months of his employment he worked on and around this

---

[65] R. 473-74.
[66] R. 518; Hypersomnolence is defined as a sleep disorder of central nervous system characterized by prolonged nocturnal sleep and periods of daytime drowsiness. Hypersomnolence, Idiopathic, http://www.reference.md/files/D020/mD020177.html (last visited May 8, 2014).
[67] R. 8.
[68] R. 12.
[69] Id.; R.42.
[70] R. 32, 39-41, 51-57, 67, 105-112,
[71] R. 48-49.
[72] R. 32.
[73] R. 52-54.
[74] R. 53.
[75] R. 105-06.

machinery,[76] this work was not optional, and it was part of his supervisory duties to ensure that production quotas were met.[77]

In his initial disability report, Mr. Velazquez stated that he used machines, tools and equipment.[78] This initial report also stated that he stood one hour a day and sat nine hours a day and the heaviest weight lifted was less than ten pounds.[79] However, at the hearing, Mr. Velazquez clarified that as plant manager, his supervisory role did at times require him to do some heavy, physical work in addition to supervising other workers.[80] Mr. Velazquez testified that despite his desire to return to work, he could not because his neck pain and fatigue would prevent him from completing the duties required by his old position.[81]

Pamela Tucker, a Vocational Expert ("VE") also testified. She identified Mr. Velazquez's past relevant work as factory manager, which she categorized as light, skilled work.[82] The hypothetical posed to the VE was "whether an individual of advanced age with a limited education, and the past relevant work as stated in Exhibit 8D could lift and carry 20 pounds occasionally and 10 pounds frequently and can be on his feet standing, walking about six hours in an eight hour work day and sit about six hours with normal rest periods, and should avoid working around moving or dangerous machinery could do any of the work he did in the past."[83] The VE stated that this hypothetical would allow Mr. Velazquez to do his past work. When asked specifically about the machinery part she testified, "[t]hat's the part I'm not quite certain

---

[76] R. 111.
[77] *Id.*
[78] R. 222-23.
[79] R. 222-23.
[80] R. 40-41.
[81] R. 64-65. Mr. Velazquez testified that he could also not do a desk job because it would be completely new and he cannot turn his left wrist flat to type on a keyboard. R. 65-67.
[82] R. 71.
[83] R. 72.

about."[84] ALJ Anglada and the VE discussed how Mr. Velazquez supervised and helped out sometimes, and concluded that he was not required to do the hands-on work.[85] However, ALJ Anglada and Mr. Velazquez's attorney agreed that Mr. Velazquez's job as a plant manager still requires him to be around heavy moving machinery.[86] The VE testified that with Mr. Velazquez's age and limited education, his transferable skills to another skilled light job in the national economy would be to "a similar type of work because his job would be supervising production work."[87] The VE further testified that a fifty-five year old with limited education and no transferable skills would be considered disabled.[88] The VE confirmed that if Mr. Velazquez could not return to his past relevant work and was limited to performing only unskilled jobs, like the ones the VE gave in her initial response, then Mr. Velazquez would be deemed disabled.[89]

Mr. Velazquez's attorney asked the VE whether a man of "advanced age, limited education, past work as described in Exhibit, is it 8D, yes, with a lifting requirement of 10 to 20 pounds, inability to be on his feet more than three to four hours a day, and the reason I'm saying this is because the medical evidence shows that [Mr. Velazquez's] got diabetic neuropathy[90] . . . swelling in both legs, occasional ability to do repetitive tasks due to cervical pain and loss of sensation in his hands . . . bilateral upper extremity weakness and decreased function with numbness in his hands . . . inability to sustain work on a eight hour, five day basis due to fatigue caused by his diabetes and his pain . . . [whether] with all those limitations can Mr. Velazquez go

---

[84] R. 73.
[85] *Id.*
[86] R. 74.
[87] R. 74-76.
[88] R. 77-78.
[89] R. 78-79. For reference, Mr. Velazquez's alleged onset of disability was August 29, 2008 when he would have been almost 54 years old. As of September 27, 2009, Mr. Velazquez turned 55.
[90] R. 503.

back and do his past work?"[91] The VE responded that he could not, and that there were no other jobs in the national economy that a person with these limitations could do.[92]

## D. The ALJ's Decision

ALJ Anglada went through the first four steps of the five-step analysis required by 20 C.F.R. § 404.1520(a). At step one, ALJ Anglada found that Mr. Velazquez had not been engaged in substantial gainful employment since the alleged disability onset date [93] and had been unemployed since 2006.[94] At step two, ALJ Anglada determined that Mr. Velazquez suffered from several "severe" impairments. [95] The impairments ALJ Anglada recognized as severe included: diabetes, hypertension, neck and shoulder pain due to minimal degenerative changes, history of wrist injury and history of retinopathy.[96] ALJ Anglada also recognized some of Mr. Velazquez's ailments as "non-severe."[97] The medical issues deemed "non-severe" were his heart issues, renal failure, fatigue and calf pain. [98] At step three, ALJ Anglada considered Mr. Velazquez's severe impairments and found that none met the criteria of one of the listed impairments, which allows an immediate finding of disability.[99] Moving on to step four, ALJ Anglada determined Mr. Velazquez's residual functional capacity ("RFC").[100]

ALJ Anglada found Mr. Velazquez's RFC to be:

I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lifting and carrying less than 20 pounds occasionally and 10 pounds frequently; standing walking, and sitting about 6 hours in an

---

[91] R. 113-14.
[92] R. 114.
[93] 20 C.F.R. § 404.1520(b); R. 10.
[94] R. 10.
[95] *Id.*
[96] R. 10.
[97] *Id.*
[98] *Id.*
[99] 20 C.F.R. Pt. 404, Subpt. P, App. 1.
[100] 20 CFR § 404.1520(e).

8 hour workday with normal rest periods; and no work around moving or dangerous machinery.[101]

ALJ Anglada moved on to determine whether Mr. Velazquez had the RFC to perform the requirements of his past relevant work.[102] At this point, ALJ Anglada followed a two-step process to determine: (1) whether there were underlying medically determinable physical or mental impairment(s) that could cause the alleged symptoms and (2) the intensity, persistence and limiting effects of the symptoms to determine the extent to which the impairments limit Mr. Velazquez's functioning.[103]

ALJ Anglada concluded that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they are inconsistent with the above RFC."[104] ALJ Anglada compared Mr. Velazquez's severe impairments to the medical evidence and determined that despite the objective medical evidence in the record, Mr. Velazquez's claims about the limiting effects of his severe impairments were not credible.[105]

Additionally, on the issue of credibility, ALJ Anglada focused on what he considered discrepancies between the unsigned and undated disability report and Mr. Velazquez's testimony.[106] For example, he noted that Mr. Velazquez's explanation of his job duties while testifying differed from and went beyond what he had reported on the initial disability forms. ALJ Anglada also relied on the fact that Mr. Velazquez was laid off in 2006 and did not apply

---

[101] R. 11.
[102] 20 C.F.R. § 404.1520(f).
[103] R. 11.
[104] R. 12. *Parker v. Astrue,* 597 F.3d 920, 921-22 (7th Cir. 2010).
[105] R. 12 – 14.
[106] R. 14.

for benefits until three years later to discredit his disability claim.[107] Lastly, ALJ Anglada used Mr. Velazquez's activities of daily living to portray him as less than credible and further discount his testimony.[108]

Based on the severe impairments he recognized, the VE's testimony, the medical evidence in the record, and the discredited testimony of Mr. Velazquez, ALJ Anglada determined that Mr. Velazquez was capable of performing his past relevant work as a plant manager because this work "does not require the performance of work-related activities precluded by . . . [his] RFC."[109] Thus, ALJ Anglada concluded that Mr. Velazquez had not been under a disability from January 1, 2007[110] through the date of his decision.[111]

### III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court's scope of review is limited to determining whether the Commissioner's findings are supported by substantial evidence.[112] Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."[113] The Court does not reweigh the evidence, decide conflicts in the record, make credibility determinations, or substitute its own judgment.[114] The Court only ensures that the Commissioner has built a logical bridge between the evidence and his conclusion.[115] This requires a critical review of both the evidence that supports and the evidence that detracts from the

---

[107] R. 14.
[108] *Id.*
[109] R. 15.
[110] *See* R.276 (showing ALJ Anglada referred to Mr. Velazquez's original alleged date of disability, which he amended to August 29, 2008 before the hearing).
[111] R. 15.
[112] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).
[113] *Id.* (quoting *Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir. 1996)).
[114] *Young v. Barnhardt*, 362 F.3d 995, 1001 (7th Cir. 2004).
[115] *Clifford,* 227 F.3d at 872 (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)).

Commissioner's decision. In order to affirm the decision, the Court must conclude that the record contains substantial evidentiary support and a meaningful discussion of the issues.[116]

## IV. ANALYSIS

Mr. Velazquez contends that ALJ Anglada erred in two regards, and therefore, the Court must remand the decision for further proceedings.[117] First, Mr. Velazquez contends that, at step four of the analysis, ALJ Anglada did not set forth the specific demands of Mr. Velazquez's past work as a plant manager and failed to make a finding as to whether Mr. Velazquez's past job or the job as generally performed required him to work around moving or dangerous machinery in deciding that he could perform that work.[118] Second, Mr. Velazquez contends that ALJ Anglada's credibility finding was insufficient because he used boilerplate language without offering reasons grounded in the evidence to support his finding of incredibility.[119]

**A. The ALJ's RFC Determination at Step Four Lacks any Discussion of Whether Mr. Velazquez's Past Work Involved Working Around Moving or Dangerous Machinery.**

ALJ Anglada's RFC determination concluded that Mr. Velazquez could perform light work,[120] except lifting and carrying less than twenty pounds occasionally and ten pounds frequently, standing, walking and sitting six hours in an eight hour workday with normal rest periods and no work around dangerous or moving machinery.[121] ALJ Anglada asserted that this determination was based on the symptoms to the extent to that they could reasonably be accepted as consistent with the objective medical evidence and "other evidence."[122] In sum, ALJ Anglada

---

[116] *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).
[117] Dkt. 16.
[118] *Id.*
[119] *Id.*
[120] 20 C.F.R. § 404.1567(b).
[121] R. 11; 20 C.F.R. § 404.1545(a)(1) – (4).
[122] R. 11.

found that Mr. Velazquez's past relevant work was skilled light work, and since he was limited to light work, he could return to his past relevant work.[123]

Mr. Velazquez argues that ALJ Anglada should have set forth specific physical demands of Mr. Velazquez's past work, and that summarily characterizing the work as light skilled work and concluding he could return to his past relevant work, was erroneous.[124] Further, Mr. Velazquez asserts that because ALJ Anglada made a specific RFC finding that he could not work around moving or dangerous machinery, he was required to determine if his past relevant work required him to be around moving or dangerous machinery. Mr. Velazquez cites *Smith v. Barnhart*, to support his contention that ALJ Anglada should have determined the specific physical demands of his past relevant work instead of merely generalizing it as light skilled work.[125] Mr. Velazquez contends that ALJ Anglada's lack of clarity when addressing the conflicting evidence about the demands of his past work and whether it involved working around moving or dangerous machinery before concluding he could return to it constitutes reversible error.

In response to this argument, the Commissioner states that ALJ Anglada reasonably considered the demands of Plaintiff's past work. The Commissioner argues that Mr. Velazquez's past work was skilled, light work and that some of his duties included supervision, maintenance and development of production standards.[126] Moreover, in response to Mr. Velazquez's contention that his past relevant work involved moving or dangerous machinery, the

[123] R. 15.
[124] Dkt. 16.
[125] *Smith*, 388 F.3d at 252-53.
[126] Dkt. 31.

Commissioner argues that ALJ Anglada "implicitly concluded" that Mr. Velazquez's past work did not involve work around dangerous or moving machinery.[127]

The RFC determination sets forth what the claimant can do despite his limitations and must be made only after consideration of all relevant medical and non-medical evidence and a claimant's statements of what he can or cannot do.[128] In *Smith*, the Seventh Circuit found that the ALJ erred in summarily concluding that the claimant was not disabled because her RFC determination was that she could perform sedentary work and her past relevant work was sedentary.[129] The Court stated that in certain circumstances, a person who is able to do some sedentary work, but not the work they once did, could still be deemed disabled because of the specific physical demands of their past relevant work.[130] While the ALJ can determine the existence of a disability based on whether the applicant can perform the functional demands and job duties of his past occupation as generally required by that occupation in the national economy, the job must not be described so broadly as to encompass a wide range of physical and mental abilities some of which the applicant may not have.[131] Further, in *Getch v. Astrue,* cited by the Commissioner, the Seventh Circuit found reversible error when the ALJ in that case, failed to consider and resolve whether the claimant's previous position involved conditions "incompatible with his medical condition."[132]

Here, ALJ Anglada failed to build a logical bridge between the conflicting evidence contained in the record and the RFC which he relied on to find that Mr. Velazquez could return to his past relevant work and was not disabled. Although the burden remains on Mr. Velazquez

---

[127] Dkt. 31.
[128] 20 C.F.R. § 404.1545(a)(1) – (4).
[129] *Smith*, 388 F.3d at 252.
[130] *Strittmater v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984).
[131] *Smith*, 388 F.3d at 253.
[132] *Getch v. Astrue*, 539 F.3d 473, 479, 482 (7th Cir. 2008).

to prove that he is unable to return to his past relevant work, ALJ Anglada was required to make findings as to the specific demands of a previous job in deciding that a claimant can return to that job.[133] ALJ Anglada did not articulate the specific physical demands of Mr. Velazquez's past relevant work in concluding that is was light skilled work, which he could perform, or articulate whether his past relevant work as generally performed required work around moving or dangerous machinery. Mr. Velazquez's initial testimony revealed that he worked outside in the plant, supervised the workers, and at times, had to show them how to use various pieces of machinery.[134] Mr. Velazquez testified that his duties as plant manager involved operating dangerous and moving machinery including pay loaders, mack trucks, and bobcats.[135] He stated that in the last six months of his employment he worked on and around this dangerous machinery.[136] He clarified that this work was not optional as it was part of his supervisory duties to ensure that production quotas were met.[137]

Moreover, the VE's testimony highlights ALJ Anglada's need to address this issue. The hypothetical she was asked, in part, was "whether an individual of advanced age and the past relevant work in Exhibit 8D who could lift and carry twenty pounds occasionally and ten pounds frequently . . . and who should avoid working **around dangerous machinery** could return to his past relevant work as plant manager."[138] The VE testified that the machinery part of the hypothetical she was "not quite certain about."[139] ALJ Anglada commented, "working around moving machinery, he doesn't have to work on the machinery, he has to supervise the people who do it." The VE replied, "Right." Thus, it seems that it was the VE's understanding that the

---

[133] *Getch*, 539 F.3d at 480; *Nolen v. Sullivan*, 939 F.2d 516, 517-18 (7th Cir. 1991).
[134] R. 32, 40-41, 53.
[135] R. 105-06.
[136] R. 111.
[137] *Id.*
[138] R. 72 (emphasis added).
[139] R. 73.

hypothetical past relevant work did not require work on the machinery.[140] This directly contradicts Mr. Velazquez's testimony concerning his required duties,[141] and, ALJ Anglada failed to reconcile this issue, which was important given that one of Mr. Velazquez's limitations prohibited working **around** moving or dangerous machinery.[142]

There is unresolved contradicting evidence in the record regarding Mr. Velazquez's duties as a plant manager.[143] On one hand, the VE limited his duties to supervising laborers and paperwork, but on the other hand Mr. Velazquez's testimony indicated his duties included work around and directly with moving and dangerous machinery.[144] In light of the RFC prohibiting Mr. Velazquez from working around heavy machinery, ALJ Anglada erred by failing to clearly resolve this conflicting evidence and clearly explain whether he believed that Mr. Velazquez's past job required work around heavy machinery.[145] Similar to the ALJ's in *Smith* and *Getch*, here, ALJ Anglada made only conclusory statements that based on the Mr. Velazquez's RFC as compared to "the physical and mental demands of this work, I find that the claimant is able to perform it as generally performed."[146] Whether Mr. Velazquez's past work required him to work around dangerous machinery directly impacted the hypothetical asked of the VE, ALJ Anglada's final RFC determination, and ultimately, the finding of no disability.[147] As the Seventh Circuit

---

[140] R. 73.

[141] R. 11.

[142] *Id.* (emphasis added).

[143] R. 222; *See also* R. 105-06, 107 (Mr. Velazquez testified that at times he did the same work as the laborers, but the ALJ found this testimony incredible because Mr. Velazquez did not include it in his original SSA Disability Report form).

[144] R. 105-06.

[145] *Getch*, 539 F.3d at 481 (stating that although the ALJ does not have to provide in writing his consideration of every piece of evidence, he should have considered whether the claimant could return to past relevant work despite a condition that may be in direct contradiction of a listed limitation in the RFC).

[146] R. 15.

[147] *See Getch,* 539 F.3d at 481 (reversing because the ALJ failed to adequately consider the impact of the claimant's workplace environment on his ability to return to his past relevant work).

instructed in *Smith* and *Getch,* concluding a claimant can perform his past relevant work, without considering the specific physical demands of the position constitutes reversible error.[148]

## B. The ALJ's Credibility Determination

ALJ Anglada discounted Mr. Velazquez's testimony concerning the extent of his disabilities.[149] ALJ Anglada's decision deems Mr. Velazquez's testimony incredible to the extent that there were inconsistencies with ALJ Anglada's residual functional capacity assessment.[150] ALJ Anglada concluded that Mr. Velazquez was less than fully credible.[151] ALJ Anglada's determination of incredibility is premised on inconsistencies between the disability report and his testimony at the hearing, the fact that Mr. Velazquez was laid off work in 2006 but did not apply for benefits until three years later, and ALJ Anglada's view that Mr. Velazquez's allegations of disabling limitations were not consistent with his activities of daily living.[152]

Mr. Velazquez contends that the ALJ's credibility finding consisted of meaningless boilerplate language, which was not sufficiently grounded in the objective evidence in the record. First, Mr. Velazquez asserts that his testimony at the hearing was a more detailed description of his job duties and medical problems, and that did not warrant ALJ Anglada considering his testimony inconsistent for purposes of finding him incredible. Second, the objective medical evidence supported his claims for disability. Third, ALJ Anglada over-emphasized the fact that Mr. Velazquez had been laid off from his last job as plant manager in 2006 and did not file an application for disability until 2010. Finally, ALJ Anglada's use of his daily activities as support to find his claims incredible was improper.

---

[148] *Smith,* 388 F.3d at 252; *Getch,* 539 F.3d at 480, 484.
[149] R. 14.
[150] R. 12.
[151] R. 14.
[152] *Id*.

In response, the Commissioner argues that ALJ Anglada properly considered the inconsistencies between Mr. Velazquez's testimony and the report he filed when initially applying for disability in sufficient detail to offset the use of boilerplate language.[153] Also, the Commissioner argues that ALJ Anglada's conclusion that the medical evidence did not support Mr. Velazquez's claim that his neck pain was his major impairment was not a mischaracterization of the evidence in the record.[154] The Commissioner relies on the April 2010 MRI results and the fact that Mr. Velazquez reported being happy with the physical therapy he received.[155] The Commissioner argues that ALJ Anglada did not err when he considered the fact that Mr. Velazquez was laid off from his job and did not leave for medical reasons. Finally, the Commissioner contends that ALJ Anglada appropriately relied on Mr. Velazquez's daily activities as inconsistent with his complaints of disability to support his overall finding of incredibility.[156]

The record is replete with ALJ Anglada's credibility findings concerning Mr. Velazquez's claims.[157] While this Court will not disrupt these findings in full, the ALJ's determinations that Mr. Velazquez's testimony was generally incredible are problematic in two regards.[158] First, there is corroborating objective medical evidence in the record to support Mr. Velazquez's statements. Second, ALJ Anglada improperly relied on Mr. Velazquez's daily activities to discredit his claims of disability and determine he could return to his past relevant work.

---

[153] Dkt. 31.
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] R. 14.
[158] R. 12.

## 1. The Objective Medical Evidence

ALJ Anglada discounted both the objective medical evidence in the record and Mr. Velazquez's corroborating testimony at the hearing to find Mr. Velazquez's articulation of the intensity, persistence and limiting effects of his symptoms of disability not credible.[159] Mr. Velazquez cites *Bjornson v. Astrue* arguing that ALJ Anglada's credibility finding was insufficient because it uses language the Seventh Circuit has declared "meaningless boilerplate."[160] Mr. Velazquez also cites *Filus v. Astrue*, for the proposition that the Seventh Circuit only allows the use of boilerplate language if the ALJ offered reasons grounded in the evidence to support the credibility finding.[161]

The Commissioner cites a recent unpublished Seventh Circuit case, *Richison v. Astrue*, arguing that the use of boilerplate language does not require reversal where the ALJ "said more."[162] Thus, the Commissioner argues that reversal is not appropriate here because ALJ Anglada "said more" and sufficiently articulated his reasoning for discrediting Mr. Velazquez.[163] The Commissioner agrees that the use of boilerplate language alone cannot support a finding of incredibility.

ALJ Anglada's determination of credibility is entitled to deference unless it is patently wrong.[164] In reviewing a credibility determination, the Court looks to the reasoning and support used by the ALJ to decide if the decision was patently wrong.[165] The ALJ is required to consider the entire record, plaintiff's statements, and the opinions of treating physicians.[166] Additionally,

---

[159] R. 12-14.
[160] *Bjornson*, 671 F.3d 640, 644-46 (7th Cir. 2012).
[161] *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).
[162] *Richison v. Astrue*, 2012 WL 377674, at *3 (7th Cir. Feb. 7, 2012).
[163] *Filus*, 694 F.3d at 868.
[164] *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).
[165] *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003).
[166] SSR 96-7p.

the Seventh Circuit has held that if subjective complaints of pain are substantiated by medical evidence in the record, the Commissioner cannot disregard them.[167]

Here, ALJ Anglada found Mr. Velazquez's report of limitations incredible despite the objective medical evidence in the record to support each of the claimed impairments. Unlike in the *Richison* case cited by the Commissioner, ALJ Anglada does not explain why he discredits testimony that is clearly supported by objective medical evidence in the record.[168] Instead, he eventually discredits the vast majority of Mr. Velazquez's testimony concerning his medical impairments. In *Scivally v. Sullivan*, the Seventh Circuit found that the ALJ erred in concluding that claimant's allegations of pain and limitations were inconsistent and unsubstantiated when there was evidence in the record that the claimant had degenerative arthritis, disc bulging, and bone spurs, that could reasonably be expected to cause pain.[169] In that case, the Seventh Circuit held that where the ALJ improperly disregarded objective medical evidence and complaints of pain, further proceedings were required to determine the claimant's actual residual functional capacity.[170]

Similarly, Mr. Velazquez's subjective reports of pain in regards to his neck, shoulder, and back impairment are corroborated by the medical evidence. His medical record clearly substantiates that he suffers from multilevel spondylosis (arthritis of the neck), bulging disc, and osteophytes (bone spurs).[171] Also, like in *Scivally*, Mr. Velazquez's records continuously refer to

---

[167] *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992); see also *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).
[168] *Richison*, 2012 WL 377674, at *3.
[169] *Scivally*, 966 F.2d at 1077.
[170] *Id.* at 1078.
[171] R. 390-91.

complaints of pain and treatment plans intended to address these issues. [172] Further, Mr. Velazquez attended physical therapy for the continued pain associated with these problems. [173]

Instead of viewing this as corroborating evidence, the ALJ used this against Mr. Velazquez highlighting that after two months of physical therapy Mr. Velazquez reported having less pain. [174] Although Mr. Velazquez experienced improvement, some improvement with treatment is expected. [175] At no time did Mr. Velazquez report not being in some kind of pain from his back, shoulder and neck impairments. The record indicates that following physical therapy, Dr. Clar prescribed Mr. Velazquez a medication used to treat pain, Gabapentin [176] and arranged for him to have a home tracking unit, both of which are only explained as further treatment for his back, neck and shoulder pain. The record shows that Mr. Velazquez's pain continued and corroborated his testimony of ongoing complaints of pain. [177]

Further, at the hearing, Mr. Velazquez testified that he did physical therapy for as long as it was allowed. [178] After his doctor stopped the therapy, he was told there was nothing else they could do, and the neck and shoulder pain was something he had to deal with. [179] Mr. Velazquez testified that he received a prescription for pain medication to manage the pain in his shoulders and neck that he had been taking for a year at the time of the hearing. [180] He testified that the pain in his neck is constant. [181] Accordingly, this Court finds that ALJ Anglada erred in discrediting Mr. Velazquez when the objective medical evidence substantiated his subjective reports of pain,

[172] R. 511.
[173] R. 512.
[174] R. 14.
[175] R. 462.
[176] ALJ Anglada also discounted Mr. Velazquez's treating physician Dr. Clar's medical decision that these medications were necessary to treat Mr. Velazquez's ailments. R. 13; *See* MedlinePlus: Gabapentin, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html#other-uses (last visited May 8, 2014).
[177] R. 512.
[178] R. 43.
[179] *Id.*
[180] *Id.;* R. 44.
[181] R. 60.

and ALJ Anglada failed to offer reasons to discredit Mr. Velazquez. The use of boilerplate language without further explanation is improper and grounds for remand.

### 2. Improper Use of Daily Activities

Finally, ALJ Anglada found that Mr. Velazquez's allegations of disabling limitations were not consistent with his activities of daily living.[182] Based on this finding, ALJ Anglada concluded that Mr. Velazquez's activities of daily living support the conclusion that he is able to engage in his past relevant work as plant manager.

Mr. Velazquez contends ALJ Anglada erroneously relied on his ability to complete basic daily activities like caring for his personal grooming, walking a few blocks to the grocery store, doing light household chores, and paying bills. Mr. Velazquez asserts that ALJ Anglada erred in concluding that he could return to his past relevant work as a full-time plant manager based, in part, on his ability to do certain daily activities.

The Commissioner argues that the ALJ's credibility determination is reasonable and entitled to substantial deference unless it is shown to be patently wrong.[183] The Commissioner asserts that ALJ Anglada properly considered Mr. Velazquez's ability to do certain daily activities including driving short distances, traveling on public transportation, caring for personal grooming, grocery shopping, light household chores, and paying bills to find his testimony at the hearing about the extent of the limitations he suffers less than fully credible.[184]

The Seventh Circuit has explicitly said that minimal daily activities should not be used to support the contention that a claimant can participate in substantial physical activity, like

---

[182] R. 14.
[183] R. 31.
[184] *Id.*

working a full time job, or to discredit his complaint of pain.[185] In *Clifford*, the claimant testified that she completed typical household chores which took around two hours, cooked simple meals, could vacuum with pain, went to the grocery store a few times a month, carried groceries from the car to the apartment, babysat her grandchildren, walked three to five blocks for exercise, and played cards a couple times a month.[186] The ALJ used this testimony to substantiate its finding that her claims of disabling pain were not credible. The court found that the ALJ erred in using Clifford's daily activities to undermine her claims of disabling pain because her ability to complete minimal daily activities was not enough on its own to support such a finding, and the objective medical evidence corroborated that she had sought treatment for pain and her other physical impairments on various occasions.[187]

Here, Mr. Velazquez testified that he does not cook, he can walk one and a half blocks to the grocery store to get groceries, but he is very tired when he gets back.[188] If he walks two blocks he is very tired.[189] Mr. Velazquez also said he can do light household chores, but he tires easily when doing outside yard work. Further, Mr. Velazquez's testified that when his wife cannot cook, her cousin comes over to cook and clean their household.[190] Based on Seventh Circuit jurisprudence, ALJ Anglada improperly discredited Mr. Velazquez's allegations of disability based on his limited activities of daily living. ALJ Anglada improperly concluded based on the same activities that Mr. Velazquez could return to his full time work as a plant manager. It appears that ALJ Anglada focused on other daily activities such as the fact that Mr. Velazquez watches football, lives with his long-term partner and goes to church to support his

---

[185] *Clifford,* 227 F.3d at 872; see also *Gentle v. Barnhart,* 430 F.3d 865, 867 (7th Cir. 2005) (stating that the ALJ erred in equating household work to work in the labor market).
[186] *Clifford*, 227 F.3d at 872.
[187] *Id.; see also Carradine,* 360 F.3d at 755-56 (discussing how the ALJ erred in finding the Plaintiff's claims of pain incredible based on the fact that she testified to walking two miles, driving, shopping and doing housework).
[188] R. 46-47.
[189] *Id.*
[190] R. 50.

finding that Mr. Velazquez's claims were not credible. ALJ Anglada failed to explain how these activities are evidence that Mr. Velazquez can perform his past relevant work. This Court finds those activities irrelevant to any meaningful analysis as to whether Mr. Velazquez's activities of daily living are inconsistent with his complaints of pain or whether these activities show that he can perform his past relevant work as a full time plant manager.[191] As such, the ALJ Anglada inappropriately relied on Mr. Velazquez's activities of daily living to find Mr. Velazquez's testimony concerning his impairments incredible, and also, in using his limited ability to complete these activities of daily living to support the finding that he can engage in past relevant work as a plant manager.

## V. CONCLUSION

For the reasons set forth above, the Court finds that ALJ Anglada's May 9, 2011 decision failed to provide an adequate basis for the determination that Mr. Velazquez could return to his past relevant work and whether or not this work required him to be around moving or dangerous machinery. Additionally, the Court finds that ALJ Anglada's determination of the Plaintiff's credibility is devoid of both clear reasoning and support grounded in the evidence in the record. Accordingly, Mr. Velazquez's motion for summary judgment [dkt. 15] is granted. This matter is remanded to the Commissioner for further proceedings consistent with this decision.

**ENTERED: May 8, 2014**

_____
**UNITED STATES MAGISTRATE JUDGE**
**Susan E. Cox**

---

[191] R. 14.